# IN THE CHANCERY COURT
## FOR KNOX COUNTY, TENNESSEE

Felon R. Wilson, individually;

    Plaintiff,

v.

Luxe Homes and Design Inc., a Tennessee
Corporation; Plantation,
Reclaimed Inc., a Tennessee Corporation;
Jenny Blalock, individually, and James
Blalock, individually;

    Defendants.

No. 192292-3

FIRST AMENDED COMPLAINT

JURY DEMANDED

2017 MAY -8 AN 9: 02
rHOWARD G. HOGAN

FILED

Plaintiff Felon R. Wilson alleges as follows:

## PARTIES AND JURISDICTION

1.  Felon R. Wilson ("Plaintiff") is an individual resident of Knoxville, Knox County, Tennessee, residing at 7203 Iron Duke Way Knoxville, TN 37919.

2.  Defendant Luxe Homes and Design Inc. is ("Luxe") a corporation authorized to do business in the State of Tennessee, duly incorporated and chartered under the laws of the State of Tennessee, doing business under the name of Luxe Homes and Design Inc. with its principal place of business at 1122 Anthem View Lane, Knoxville, Knox County, Tennessee.

3.  Defendant Plantation Reclaimed Inc. is ("Plantation Reclaimed"), upon information and belief, a corporation authorized to do business in the State of Tennessee, duly incorporated and chartered under the laws of the State of Tennessee, doing business under the name of Plantation Reclaimed Inc. with its principal place of business at 1122 Anthem View Lane, Knoxville, Knox County, Tennessee.



1

4. Defendant Jenny Blalock is an individual resident of Knoxville, Knox County, Tennessee, residing at 1122 Anthem View Lane, Knoxville, Tennessee.

5. Defendant James M. Blalock (also known as "Jim") is an individual resident of Knoxville, Knox County, Tennessee, residing at 8336 Martin Mill Pike, Knoxville, TN.

6. This Court has jurisdiction over this matter pursuant to Tenn. Code Ann. § 16-10-101. Venue is proper pursuant to Tenn. Code Ann. § 20-4-101, et seq., this being the County in which the real property is located, in which the cause of action arose, and in which both the plaintiff and Defendants reside and/or have their principal place of business.

## ALLEGATIONS

7. That on or about June 1, 2015, Plaintiff entered into a Fixed Fee Construction Agreement with Jenny Blalock of Luxe Home Designs for the construction of a house on the property located at 7203 Iron Duke Way Knoxville, TN 37919 for the contract price of $615,947. (Copy of Contract is attached as Exhibit 1.).The Contract stated that the estimated completion date would be January 30, 2016. Defendants were aware that time was of the essence for Plaintiff.

8. Plaintiff repeatedly requested a copy of the fully executed contract from Defendant Jenny Blalock, but she either ignored Plaintiff's requests or stated that she would provide the Contract, without actually providing a copy of the executed Contract to Plaintiff.

9. The signatories to the Contract were Defendant Jenny Blalock and Felon Wilson.

10. The Contract was drafted by Luxe or its attorney.

11. Defendant Jenny Blalock communicated to Plaintiff, performed services, and provided services to Plaintiff through her companies Luxe and Plantation Reclaimed.

1

2

12.    Defendants failed to properly communicate with and oversee subcontractors. Further, Defendants failed to demonstrate a basic understanding of certain construction materials and processes.

13.    Defendants did not provide materials as specified in the Contract and instead used cheaper materials or required Plaintiff to pay more monies to construct properly or as properly contemplated by the parties.

14.    On numerous occasions, Defendants deviated from the parties' agreement; and/or used cheap construction materials or processes, and/or used construction materials or processes unapproved by the Plaintiff and demanded that Plaintiff pay amounts above the fixed fee in the Contract to correct such deviations or to replace the cheap or unapproved construction materials or processes.

15.    Defendants demanded that Plaintiff pay amounts above the fixed fee set forth in the Contract due to Defendants' failure to properly include such amounts in the Contract price or for work commenced without the approval of Plaintiff.

16.    Defendants failed to follow neighborhood covenants or properly calculate the landscaping Contract price, forcing Plaintiff to hire third party contractors and incur additional expenses.

17.    Defendant Jenny Blalock agreed to provide financial information relating to the construction to Plaintiff for his tax returns, but then failed to actually provide such information until Plaintiff submitted numerous requests to Defendant Jenny Blalock. The financial information that Defendant Jenny Blalock finally provided was incomplete.

3

18. Defendants used unqualified contractors, rather than spending money on qualified contractors for substantial portions of the house, including, but not limited to, Defendant Jenny Blalock and her father, Defendant James Blalock, building portions of the house themselves.

19. Defendant did not use licensed individuals to perform all work, as outlined by law.

20. Despite Plaintiff's requests to clean the construction site, Defendants maintained the construction site in a sloppy manner, prompting complaints from the neighborhood developer and neighbors.

21. In an effort to increase her profit margins, Defendant tried to convince Plaintiff to substitute agreed-upon materials with cheap building supplies or installed cheap and poor quality building materials without seeking approval of Plaintiff.

22. Defendants misrepresented materials to be used in construction and then demanded additional monies from Plaintiff to meet contractual requirements.

23. In exchange for early payment, Defendant Jenny Blalock agreed to reduce certain amounts that she claimed that Plaintiff owed her.

24. On or around June 13, 2016, Plaintiff's attorney sent a notice of breach of contract to Defendants.

25. Defendants did not reply to, deny, or dispute any breach of contract claims made by Plaintiff's attorney's notice of breach of contract letter.

26. Plaintiff and Defendants agreed that no pictures of the house were to be used for any advertising or promotion. Defendants then used pictures of the inside of the house in paid advertisements, photographs used in third party showrooms, social media, and on the website of Defendant "Plantation Reclaimed,"

4

27. On July 1, 2016, at Defendant's direction, commercial photographerBeth Fellhoelter took pictures of the exterior of Plaintiff's home.

28. On November 8, 2016, approximately one day after submitting her response to Plaintiff's complaint with the Tennessee Contracting Licensing Board, Defendants uploaded 20 pictures of Plaintiff's house to Defendant Plantation Reclaimed Facebook page.

29. After receiving full payment from Plaintiff, Defendants failed to complete construction of the home and performed only a few one-off projects on the home, even after receiving requeststo fix and/or complete the construction, including notices from the City of Knoxville regarding building code violations.

30. There was never a walkthrough or closing on the house.

31. Plaintiff made numerous demands upon Defendants for repair of the deficiencies or incompletions which they have found, but Defendants failed to respond and refused to remedy the majority of such deficiencies, including failure to complete punch lists.

32. To date, Plaintiff has discovered, *inter alia*, the following defects with the property, such defects arising due to the construction methods, attempts at repair, and/or materials used by Defendants (The following list of deficiencies, poor workmanship, and incompleteness is not exhaustive):

    a. Failure to anchor the gutter, which is detached.

    b. Defendant Jenny Blalock and her father James Blalock partially constructed the porch themselves with materials that do not match in appearance or consistency to the rest of the house. The back porch door is crooked, has a gap at the top, and should be closable with a knob not a hook. Paint was applied over unprimed and dirty surfaces.

5

c.    Due to poor installation, nails that were installed around windows inside of the house go through the wall and can be seen outside the home.

d.    Doors to the exterior of the house are not properly sealed causing gaps in weather-stripping and visible light shining through.

e.    The windows were improperly installed, resulting in crooked windows, windows not being caulked and/or sealed properly, gaps of coverage on exterior sealing, and lack of window sills.

f.    There is damage to brick and walls, including, but not limited to, scratches, inadequately painted brick (resulting in peeling), inconsistent mortar, missing mortar, and other defects.

g.    Defendants installed garage door panels of different color than the other garage doors.

h.    The sewer pipe cleanout is not finished and/or installed correctly, including the fact that it is sticking vertically in the air for fourfeet and is not covered with a protective cap.

i.    The crawl space door was built with poor workmanship like quality, does not properly fit the home, has air gaps surrounding the door, has a negligently installed latch allowing a person to be locked in the crawl space, was constructed and installed without consideration for being weather tight, and does not architecturally match remainder of the house.

j.    The crawl space vents are loose,broken, do not fit properly, and are covered with mud.Someof the crawl space vents are located directly below exterior water spouts.

k.    There are structural errors and moisture issues.

l.    The porch columns are open on top allowing rainwater to enter.

6

m.    There is an improper or insufficient amount of sealant on the interior and exterior portion of doors.

n.    Defendants failed to install materials of the quality set forth in the Contract, such as bronze gutters.

o.    Knots and cracks on the ceiling from wood are coming through the paint.

p.    There are exposed and damaged concrete blocks around the inside of garage.

q.    The steps leading into the house from the garage are unfinished wood and vertically uneven.

r.    The Defendants failed to provide a garage door opener for one of the garage doors.

s.    There is damage to the structure of the home in between the garage doors on the interior. Mortar was splashed on this block to hide the broken block.

t.    Throughout the house, the door stops are stuck to the wall as a result of being applied to wet paint.

u.    Defendants have failed to properly paint and to do proper, if any, finishing to the trim after it was installed.

v.    There are large portions of the house that were either not sanded or insufficiently sanded, leading to rough and unfinished surfaces, including, but not limited to, trim throughout the house.

w.    The sheetrock was not finished properly, including not properly sanded.

7

x.    Defendant Jenny Blalock attempted to repair scratches to wood floors in kitchen area, using an unknown liquid that further damaged the floors, possibly requiring Plaintiff to have to replace the entire wood floor.

y.    Defendants attached a blank piece of plastic to the wall as a workaround to save Defendants money, instead of properly fixing the sheetrock when they cut too big of a hole for an electrical plug.

z.    The inside trim on the widows wasinconsistent and not sanded properly.

aa.    The kitchen countertops were installed with permanent water spots. This is despite the fact that Plaintiffpaid Defendantsan amount in addition to that set forth in the Fixed Fee Agreement to seal these countertops.

bb.    Defendant charged Plaintiff an amountabove the set forth in the Fixed Fee Agreement to seal the countertops, despite the fact that their Supplier seals all countertops for no extra charge.

cc.    Lights in the home were improperly installed, resulting in the lights being crooked, and/or not anchored correctly.

dd.    There are cracks in various portions of the ceiling.

ee.    Sheetrock was not properly applied to portions of ceiling, resulting in chunks of sheetrock in some areas.

ff.    The plumbing fixtureswere inoperable, including, but not limited to inoperative stoppers on bathroom sinks. Defendants installed a temporary workaround pop-up system, but left the inoperative leaver behind the spout in place permanently. In order to save money, Defendants installed the less expensive workaround, instead of properly fixing the inoperative stoppers or reworking the countertop. The sinks were not properly operating. The

8

lever behind the faucet, which was used to lift the stopper in the sink was inaccessible because of the placement being too close to the wall.

      gg.     The Defendants installed at least one inoperative fan switch on the interior wall.

      hh.     The Defendants improperly installed the thermostat on an unheated exterior wall, resulting in malfunctioning thermostat. Defendants ignored problem and failed to repair after numerous request.

      ii.     The Defendants failed to install an arc fault circuit breaker for the upstairs bedroom, which has an adjacent full bathroom and closet.

      jj.     Piers were incorrectly installed in the back porch area. Pier spacing is excessive in the center of house.

      kk.     Defendants failed to install a second water heater as reasonably expected for the size and layout of the home resulting in improper flow of hot water to bathrooms serving three bedrooms.

      ll.     The Defendants installed an insufficient doorbell system for the size and layout of the home.

      mm.     Two return air vents were installed in the same end of the house; thus, they were not properly spaced. Defendants improperly installed the HVAC systems resulting in improper flow of heat and cooling to opposite ends of house.

      nn.     The wood floors on the stairs are discolored and were finished by Defendants with a product different than the other wood floors in the house. Plaintiff made it clear to Defendant not to use different product anywhere. Defendants used this finish despite

9

knowledge that their previous customer was unhappy with this samefinish used on Plaintiff's stairs.

      oo.    The Contract specifies five tons of cooling for the downstairs and two tons upstairs. The Defendants or their contractors installed four tons downstairs and two and a half tons upstairs, but did not adjust the price paid by Plaintiff for the larger amount of cooling.

      pp.    There were bentand damaged and/or improper soffits were installed on the exterior of the homemultiple times.

      qq.    The Defendants or their contractors improperly installed the water closet door.

      rr.    Defendants installed misaligned doors throughout house and did not properly install latches on door facings. Defendants installed doors and latches themselves instead of hiring qualified licensed contractors.

      ss.    The safety rail on the stairs aremisaligned.

      tt.    The interior arches are uneven, inconsistent, and non-symmetrical. No trim was installed on the arches.

      uu.    The exterior brick arches over the garage are not even.

      vv.    The brick hearths are placed over a wood frame instead of a brick support. The hearths'and fireplace brick surfaceswereirreversiblydamaged due to not being cleaned after installation.

      ww.    The exterior HVAC covering is warped and was not painted adequately or correctly. Defendants used cheap materials and installed them incorrectly and did not paint with primer or secondcoat of paint.

10

xx.    Defendants installed porous trim in shower areas where mold can occur. The trim in shower areas has gaps allowing water to seep behind walls.

### *CAUSES OF ACTION*

### COUNT I - BREACH OF EXPRESS WARRANTIES

33.    All allegations in paragraphs 1 through 32 of this Complaint are hereby incorporated and re-alleged by reference.

34.    The Defendants breached the express warranties, which include:

a.    Defendants did not construct the house substantially according to the plans, specifications, and or approved change orders.

b.    The house is not free from defects in workmanship and materials.

c.    The house was not constructed in accordance with applicable building codes.

d.    Defendants did not finish items that were not completed within a reasonable time.

e.    The installation of the HVAC is not free from defects in workmanship

f.    Framing is not in place as specified in the plans.

g.    Roof guttering is unattached.

h.    Cracking has exceeded 1/4 inch.

i.    There are cracks exceeding 1/4 inch in the door.

j.    Drywall defects have not been repaired.

k.    Defendants did not repair paint.

l.    Defendants or their contractors did not repair switches.

11

m. Plaintiff submitted breaches of warranty to Defendants but they failed to cure such breaches.

## COUNT II - BREACH OF IMPLIED WARRANTIES

35. All allegations in paragraphs 1 through 34 of this Complaint are hereby incorporated and re-alleged by reference.

36. Defendants' are liable to Plaintiff for breach of the implied warranty of good workmanship as a result of, *inter alia*, Defendants' improper construction and use of poor quality materials.

37. Defendants' are also liable for breach of the implied warranty of habitability and fitness as a result of, *inter alia*, Defendants' improper construction and use of poor quality materials.

38. The Plaintiff has been damaged by the defendants' breach of the implied warranties and continues to sustain damages, including but not limited to, property damage and diminution of the value of the home.

## COUNT III - NEGLIGENT MISREPRESENTATION

39. All allegations in paragraphs 1 through 38 of this Complaint are hereby incorporated and re-alleged by reference.

40. Defendants represented to the Plaintiff that they were experienced as general contractors, Defendants were one of the finest custom homebuilder in Knoxville, and Defendants build only high-end and high-quality custom construction. Defendants represented to the Plaintiff that Defendants built only high-end homes and used the best subcontractors and materials. In addition, Defendants represented to the Plaintiff that Defendants' homes always appraise for more after completion than the customers' purchase price. Further, Defendants' stated that they had expertise in the management of money, budgets and meeting construction deadlines.

12

Defendants stated that they frequently build custom-houses within customers' budgets and this would not be the most expensive house that any of the Defendants' have built. Defendants stated they built custom homes to each customer's desires.

41.     Further, Defendants' advertisement sign situated on a vacant Anthem neighborhood lot depicted the "Glen Abbey" house design with a certain price, despite the fact that Defendant was aware that such design could not be built on said lot. Defendant's agent arranged a meeting with Plaintiff to discuss construction of this design on that specific lot, despite knowledge that it could not be done. Plaintiff relied upon these representations in beginning discussions with Defendant's agent to meet with Defendant Jenny Blalock. After tricking Plaintiff into meeting with her, she sold her other services to him.

42.     On or around May 20, 2016, Defendants, knowing Plaintiff's time and financial constraints, falsely told Plaintiff that he was not permitted to move into the home and that Defendant Jenny Blalock could and would not provide the certificate of occupancy until Plaintiff paid Defendants in full, including, all of Defendants' overages that were disputed by Plaintiff.

43.     Defendants were aware such representations were false and they were made to induce Plaintiff into paying them and entering into the Contract and/or paying Defendants as set forth in this Complaint.

44.     Plaintiff relied on these statements made by Defendants.

45.     Accordingly, as set forth herein, Defendants, who had a pecuniary interest in the Contract, negligently supplied false information to Plaintiff, including inregard to those items set forth in paragraphs 40-42. Then, Defendants subsequently failed to deliver on the Contract after the Plaintiff made a good faith effort to allow Defendants to correct its mistakes by making good on the contractual promises by which it was bound.

13

46. Plaintiff justifiably relied upon Defendants' false information and has been damaged by that reliance.

## COUNT IV- FRAUDULENT MISREPRESENTATION

47. All allegations in paragraph 1 through 46 of this Complaint are hereby incorporated and re-alleged by reference.

48. Defendants made intentional misrepresentations with regard to their expertise and experience and the performance of the Contract entered into with Plaintiff. These statements were designed and intended to mislead the Plaintiff as to Defendants' intentions of performing under the contract.

49. These representations were false when they were made.

50. These misrepresentations were made by Defendants with knowledge of their falsity and with the intent to deceive the Plaintiff.

51. The Defendants' misrepresentations were to an existing fact as set forth in Count III and this Complaint and Defendants' intention of performing its obligations under the Contract.

52. The Defendant's misrepresentations were material to Plaintiff's decision to enter into a contract with any pay money to Defendants.

53. Plaintiff reasonably relied upon these misrepresentations to his injury.

## COUNT V - NEGLIGENCE

54. All allegations in paragraphs 1 through 53 of this Complaint are hereby incorporated and re-alleged by reference.

55. Defendants owed Plaintiff a duty to exercise reasonable care in the construction of Plaintiff's home. More specifically, Defendants owed Plaintiff a duty to construct the home in a manner consistent with reasonable standards of good workmanship and in compliance with the

14

plans, developer requirements, and specifications. As described in this Complaint, Defendants have breached such duties owed to Plaintiff.

56.     Plaintiff has, as a direct and proximate result of such breach(es), sustained damages in the forms of monetary loss, increased costs of construction, decreased property value, costs of repair and increased demands on Plaintiff's time insofar as Plaintiff has been required to effectuate completion of construction.

57.     Accordingly, Defendant was negligent in the construction of the property.

58.     Plaintiff has suffered damages from Defendants' negligence in an amount estimated to be not less than FourHundred Thousand and 00/100 Dollars ($400,000.00), which sum shall be specifically proven at trial.

## COUNT VI - CONSUMER PROTECTION ACT

59.     All allegations in paragraphs 1 through 58 of this Complaint are hereby incorporated and re-alleged by reference.

60.     Tennessee Consumer Protection Act ("**Tennessee CPA**") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."Tenn. Code Ann. § 47-18-104.

61.     Plaintiff is a "natural person" and "consumer" within the meaning of Tenn. Code Ann. § 47-18-103(2).

62.     Each Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

63.     Each Defendant's conduct complained of herein affected "trade,""commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

15

64. Among other things, the Defendants engaged in a variety of unfair and/or deceptive acts in violation of 47-18-104, including:

a. Defendants represented (i) that their past customers were pleased with their services, they have completed projects successfully, and they had the necessary skills to complete the house in a workmanship like manner; and (ii) that the goods used on the home would have beneficial qualities, which were actually cheaper in application or materials costs, none of which was true in violation of Tenn. Code Ann. § 47-18-104(b)(5)and Tenn. Code Ann. § 47-18-104(b)(7).

b. Defendants advertised pictures of homes, including advertisements depicting pictures of homes on lots, which Defendants were aware could not be built on such lots or had not previously built themselves with the intent to lure Plaintiff in and construct other homes for him in violation of Tenn. Code Ann. § 47-18-104(b)(9),Tenn. Code Ann. § 47-18-104(b)(21),and Tenn. Code Ann. § 47-18-104(b)(22).

c. In violation of Tenn. Code Ann. § 47-18-104(b)(12), Defendants represented to Plaintiff that he was not permitted to move into his home until he paid all disputed amounts to Defendants in full.

d. Defendant Plantation Reclaimed acted in the capacity as a contractor while not licensed in violation of Tenn. Code Ann. § 47-18-104 (b) (35).

e. Defendants either used damaged building materials or low quality materials on the home that were deteriorated or altered to the point of decreasing the value of the home in violation of Tenn. Code Ann. § 47-18-104(b)(6).

65. This list is not exhaustive. Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiff seeks monetary relief against each Defendant measured as actual damages in an amount to be

16

determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT VII - BREACH OF CONTRACT

66. All allegations in paragraphs 1 through 65 of this Complaint are hereby incorporated and re-alleged by reference.

67. Defendants failed to complete construction by the approximate end date set forth in the Contract. Defendants were aware that time was of the essence because of Plaintiff's costs and time constraints. Defendants were aware of time constraints throughout construction. Plaintiff moved completion date on several occasions, each time well beyond promised date.

68. Under the Contract, all systems shall be in good working order. Numerous systems are inoperable or otherwise not in good working order, including, but not limited to Paragraph 32 above.

69. Defendants deviated from the plans and specifications, thereby saving themselves the expense associated with complying with the plans and specifications, and reducing the quality and value of plaintiff's home, and all of the ways described in this Complaint, thereby diminishing the value of plaintiff's home.

70. The Contract required that Defendant's comply with applicable national, state, and laws. Defendants following actions or work failed to comply with such laws, including:

    a.    Portions of the home were built in violation of building and/or electrical codes;

    b.    Defendants' utilized unlicensed contractors; and

    c.    Defendant's subcontractors violated Section 5 Chapter 2 of the OSHA Technical Manual.

17

71. Defendant Jenny Blalock agreed to deduct certain apartment rent and the sales tax for the kitchen island in exchange for early payment. Defendant refused to honor this agreement after Plaintiff performed his obligation under this Agreement.

72. Defendants failed to complete the work in a workman like manner as set forth in in this this Complaint.

73. The home constructed by Defendants and conveyed to plaintiff contains the defects listed in this Complaint, all of which materially detract from its value.

74. Defendants also contracted in the Contract to construct the home in accordance with the plans, depictions, and specifications. Defendants deviated from the plans, depictions and specifications, thereby saving themselves the expense associated with complying with the plans and specifications, and reducing the quality and value of plaintiff's home, and all of the ways described in this Complaint, thereby diminishing the value of plaintiff's home.

75. Defendants did not keep the hard costs at budget as set forth in the Contract.

76. Defendants exceeded the purchase price without a change order or authorization.

77. Defendant did not construct the home according to the construction documents, allowances, finish schedules, all addenda, change orders, modifications and specifications set forth in Exhibit A to the Contract.

78. In accordance with the Contract, Plaintiff's attorney sent notice of curable breaches of the Contract to Luxe by certified mail and email.

79. Plaintiff has suffered damages from Defendants' breach of contract in an amount estimated to be at least Four Hundred Thousand and 00/100 Dollars ($400,000.00), which sum shall be specifically proven at trial.

18

## COUNT VIII - Quantum Meruit

80.     All allegations in Paragraph 1 - 79 of this Complaint are hereby incorporated and re-alleged by reference.

81.     In the alternative of finding no contract between Plaintiff and any of the Defendants, Plaintiff asserts that there is no contract between Plaintiff and such Defendants regarding some or all of the subject matter set forth herein.

82.     Plaintiff paid high amounts of money for the goods and services.

83.     Defendants received such money knowing that it was for the goods and services in this Complaint.

84.     Defendants refused to complete such work and/or deliver work in a workmanlike manner.

85.     It would be unjust for Defendants to retain the payments made by Plaintiff.

86.     The value of the payments provide by Plaintiff shall be proved at trial, but are not less than Four Hundred Thousand and 00/100 Dollars ($400,000.00) plus interest, costs, and fees.

## COUNT VIX - PIERCE THE CORPORATE VEIL

87.     All allegations in Paragraph 1 - 86 of this Complaint are hereby incorporated and re-alleged by reference.

88.     Plaintiff seeks judgment against the Defendants Jenny Blalock and Jim Blalock, jointly and severally, for the liabilities of Defendants Luxe and Plantation Reclaimed based upon grounds for piercing the corporate veil pursuant to the law of the state of Tennessee.

89.     By their actions alleged herein, Defendants have willfully disregarded the corporate forms of Luxe and Plantation Reclaimed. Upon information and belief and as a result of Defendant Jenny Blalock's and/or James Blalock's actions as they are presently known, and

19

which include, but are not limited to, failure to sign an office lease or otherwise have any distinction between an office address and Jenny Blalock's home; a gross failure to properly capitalize the corporate entities; failure to conduct shareholder's meetings for the corporate entities; and Jenny's Blalock's acceptance of payments made to her personally, Plaintiff is entitled to pierce the corporateveilsof Luxe and Plantation Reclaimed.

90    The remedy of piercing the corporate veil is warranted herein based on the allegations set forth above and such proof as is hereinafter submitted to this Court.

## COUNT X - CONVERSION

91    All allegations in Paragraph 1 - 90 of this Complaint are hereby incorporated and re-alleged by reference.

92    Plaintiff paid Defendants $2,059 for his house plans.

93    Defendant double charged plaintiff for such house plans.

94    After repeated requests, Defendants refused to return the house plans.

## COUNT XI - PUNITIVE DAMAGES

95    All allegations in Paragraph 1 - 94 of this Complaint are hereby incorporated and re-alleged by reference.

96    Defendants' deviations from the plans and specifications were intentional and fraudulent, with Defendants possessing the conscious objective to deny and deprive Plaintiff of the quality home which they had contracted to purchase and which Defendants had contracted to provide and to profit directly from the cost savings achieved thereby. In the alternative, Defendants' deviations from the plans and specifications reflect that Defendants acted with recklessness, because they were aware of, but consciously disregarded, the fact that Plaintiff had contracted for the construction of a home containing stated features and qualities, which Defendants had agreed to construct and provide, and yet Defendants substantially and

20

unjustifiably ignored, disregarded and deviated from those plans and specifications in the construction of Plaintiffs' home in order to benefit themselves at Plaintiff's detriment. Accordingly, Defendants' conduct justifies an award of punitive damages in an amount which shall be established at trial.

WHEREFORE, PREMISES CONSIDERED, Felon R. Wilson prays as follows:

1. That process issue and be served upon Defendants Luxe Homes and Design Inc., Plantation Reclaimed Inc., Jenny Blalock, and James Blalock, and that they be required to answer this Complaint within the time allowed by law.

2. That upon a trial of this cause, Plaintiffs have and recover a judgment against Defendants for the full amount of damages they have suffered, including but not limited to the cost of repairing construction deficiencies and the greater of the loss of value or cost savings occasioned by Defendants' deviations from the plans and specifications which cannot practically be repaired, in an amount estimated to be at least Four Hundred Thousand and 00/100 Dollars ($400,000.00), which shall be more specifically proven at trial.

3. That Plaintiff's actual damages be trebled.

4. That Plaintiff has and recovers a judgment for their attorney's fees and expenses of this litigation as provided in the written contract between the parties.

5. That Plaintiff has and recovers a judgment for punitive damages against the Defendants by reason of their intentional, fraudulent and reckless conduct which has caused Plaintiffs substantial damages.

6. For such other, further and general relief to which Plaintiffs may be entitled. Plaintiff respectfully demands a jury.

21

DATED: May 3, 2016

STOEL RIVES LLP

By: _____
WILLIAM F. WILSON
Tenn. BPR No. 032440
(503) 294-9189
william.wilson@stoel.com
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Attorney for Plaintiff
Felon R. Wilson

EXHIBIT 1



## FIXED CONTRACT AMOUNT

THIS AGREEMENT, made as of June 1st in the year of 2015

Between the Owner:
**Felon and Donna Wilson**
**Lot 3 Wellsley Park**
**Knoxville, TN 37922**

And the Contractor:
**Luxe Homes and Design Inc.**
**1122 Anthem view lane**
**Knoxville, TN 37922**

For the Project:

**Article 1.    Contract Documents**

1.1    The contract documents consist of this agreement, general conditions, construction documents, specifications, allowances, finish schedules, construction draw schedule, information disclosure statement, all addenda issued prior to execution of this agreement and all change orders or modifications issued and agreed to by both parties. All documents noted herein shall be provided to the Contractor by the Owner. These contract documents represent the entire agreement of both parties and supersede any prior oral or written agreement.

**Article 2.    Scope of Work**

2.1    The Owner agrees to purchase and the Contractor agrees to construct the above mentioned structure and fixtures attached thereto in (**Knoxville, Knox County and Tennessee**) according to the construction documents, allowances, finish schedules, all addenda, change orders, modifications and specifications set forth in Exhibit A to plan "Ansley Cottage".

Exhibit 1 – Page 1

### Article 3.    Time of Completion

3.1    The approximate commencement date of the project shall be (**June 15, 2015**). The approximate completion date of the project shall be (**January 30, 2016**); however any change orders and/or unusual weather might delay or otherwise affect the completion date. Barring inclement weather or owner related delays.

3.2    Owner agrees to reimburse Builder for all costs incurred by Builder in the construction of the project (the "Hard Costs"), including but not limited to those listed below, at rates comparable to the standard rates for similar quality work in the locality of the work, except with prior consent of the Owner. Hard Costs will include the following and have been budget by builder in Exhibit A. The builder is responsible for keeping the hard cost at budget except for unforeseen items such as footers/excavation work and any acts of God:

   a.    All labor costs associated with contracted labor

   b.    Materials, supplies, equipment, equipment rental, and transportation required in the construction of the Project, which shall include all temporary structures and their maintenance, including sales, use or other taxes related thereto;

   c.    The amounts of all subcontractors;

   d.    Premiums on insurance policies Builder is required to maintain under this Agreement or by Law; and

   e.    Such other Hard Cost items included in Exhibit A

A summary of estimated Hard Costs is attached. Owner shall pay builder for the Hard Costs as follows:



W

Exhibit 1 – Page 2

**Lot 3**
**Planning**
    Plan Copies                    2,059.75
    Permits
    Utilities    Water and Sewer Taps Only    1,533.00
    silt fence

**Foundation**
    Survey                     1,000.00
    Site work                  1,500.00    tbd
    foundation vents            250.00
    Footer Labor               6,900.00    tbd
    Extra Footer Material/deep footers    1,000.00    tbd
    Block labor and material        9,500.00    tbd
    Gravel                    2,000.00    tbd
    Termites                  325.00
    Waterproofing              400.00    tbd

**Framing**
    Framing Materials
    Framing Labor

**Ext. Windows and Doors**
    Windows and Doors         18,118.60
    Overhead Doors and Installation    3,795.00    5,185 wood

**Electrical System**
    Electrical Labor
    Electrical Fixtures        13,445.00
    Underground Utilities       1,000.00    tbd

**Plumbing System**
    Plumbing Labor
    Plumbing Fixtures        11,895.00
    Water and Sewer Line      1,200.00    tbd

**HVAC System**
    HVAC
    System        3 taps

**Fireplace and Trim**
    fireplace unit              3,000.00
    Trim surround materials
    Mantle

**Roofing**
    Roofing Labor

Exhibit 1 – Page 3

Roofing Materials

**Insulation and Drywall**
    Insulation
    Drywall Labor and Materials

**Exterior Veneer**
    Brick labor
    Brick Materials
    siding labor
    siding material
    soffit material
    soffit labor
    miscell
    Guttering
    Sand

**Cabinetry and Countertops**

| | | |
|---|---|---|
| Cabinetry | | 44,381.66 |
| Sealer | | 300.00 |
| Countertops | | 13,339.00 |

**Interior Trim and Stairs**
    Interior Trim Labor
    barn wood beams in great room
    T&G materials
    roller door hardware
    Interior Trim Materials

**Floorcovering**

| | | |
|---|---|---|
| Hardwood Labor and materials | 2200' | 24,200.00 |
| shoe mold | | |
| vinyl flooring in upstairs study | 364' | 1,800.00 |
| tung oil | | |
| Carpet labor and materials | | 4,083.12 |

**Tile and Ceramics**

| | |
|---|---|
| Tile Flooring Labor | 6,500.00 |
| Tile Flooring Materials | 3,800.00 |
| Kitchen Backsplash Labor | 650.00 |
| Kitchen Backsplash Materials | 700.00 |

**Interior Finishes**
    Paint Labor
    Exterior paint labor
    Paint Materials

**Door and Closet Hardware**

| | |
|---|---|
| Door Hardware Materials | 1,500.00 |
| Closet Shelving | 5831.97 |

**Bath Hardware**

| | |
|---|---|
| Bath Accessories | 300.00 |

Exhibit 1 – Page 4

| | | | |
|---|---|---|---|
| | Mirrors | 583.00 | |
| | Shower Doors | 2,250.00 | |
| | Kitchen and Bath door hardware | 650.00 | |
| **Appliances** | | | |
| | Appliances | 5772.84 | |
| **Site Improvements** | | | |
| | Gravel for driveway/sidewalks | 3,500.00 | tbd |
| | Concrete Garage | 2,200.00 | |
| | | | includes 12x12 |
| | Pavers/porch and patio        tbd | 4,300.00 | paver patio |
| | Driveway/Sideway | 7,680.00 | tbd |
| | Landscaping labor and materials | 12,000.00 | tbd |
| | Site Improvements-Misc. | | |
| **Exterior Areas and Finishes** | | | |
| | Exterior Columns | | |
| | Screen in porch materials | | |
| | Screen in porch labor | | |
| | Column labor | | |
| | Shutters | | |
| | metal roofing | | |
| | Mailbox | | |
| **Specialty Options** | | | |
| | Security System | 2,641.65 | |
| | Garage flooring sealer and labor | 450.00 | |
| **Construction Clean Up** | | | |
| | Dumpster | | |
| | Clean up Final | | |
| **Project Insurance** | | | |
| | Builders Risk Insurance | 1,250.00 | |
| **Jobsite Facilities** | | | |
| | Portable Restroom | | |
| **Miscellaneous** | | | |
| | Rental Equipment        tbd | 500.00 | |
| **House Total** | | **615,947.00** | |
| **Lot** | | **105,000.00** | |
| **Grand Total** | | **720,947.00** | |

**Article 4.      The Contract Price**

4.1   The purchase price of the project shall be set at the sum of (Six hundred and Fifteen Thousand, Nine Hundred and Forty Seven Dollars) (**$615,947**), subject to additions and deductions pursuant to authorized change orders and allowances.  Closing costs shall be paid by the Owner.

**Article 5.      Progress Payments**

Exhibit 1 – Page 5

5.1 The Owner will make payments to the contractor pursuant to the attached construction draw schedule as work required by said schedule is satisfactorily completed. Owner shall make draw payments to contractor within (10) days after request by contractor, as approved by bank. Should the owner fail to make payment, contractor may charge a penalty of (5%) annually upon the unpaid amount until paid. Draw schedules are determined by percentage of completion by the bank.

5.2 All bills are to be paid within the term period and/or after the job is satisfactory. Contractor shall have the right to stop work or terminate the contract at her option if payments are not received. Termination by Contractor under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination. Termination by Owner under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination.

**Article 6.     Duties of the Contractor**

6.1 All work shall be in accordance to the provisions of the plans and specifications. All systems shall be in good working order.

6.2 All work shall be completed in a workman like manner, and shall comply with all applicable national, state and local building codes and laws.

6.3 All work shall be performed by licensed individuals to perform their said work, as outlined by law.

6.4 Contractor shall obtain all permits necessary for the work to be completed.

6.5 Upon satisfactory payment being made for any portion of the work performed, Contractor shall furnish a full and unconditional release from any claim or mechanics' lien for that portion of the work for which payment has been made.

**Article 7.     Owner**

7.1 The Owner shall communicate with subcontractors only through the Contractor.

7.2 The Owner will not assume any liability or responsibility, nor have control over or charge of construction means, methods, techniques, sequences, procedures, or for safety precautions and programs in connection with the project, since these are solely the Contractor's responsibility.

**Article 8.     Insurance**

8.1 The Owner will keep in force a Builder's Risk Insurance Policy on the said property to protect both owner's and contractor's interests until construction is completed.

8.2 The Owner will purchase and maintain property insurance to the full and insurable value of the project, in case of a fire, vandalism, malicious mischief or other instances that may occur.

8.3 The Contractor shall purchase and maintain needed Workman's Compensation and Liability insurance coverage as required by law and deemed necessary for his own protection.

## Article 9. General Provisions

9.1 If conditions are encountered at the construction site which are subsurface or otherwise concealed physical conditions or unknown physical conditions of an unusual nature, which differ naturally from those ordinarily found to exist and generally recognized as inherent in construction activities, the Owner will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, and/or time required for, performance of any part of the work, will negotiate with the Contractor an equitable adjustment in the contract sum, contract time or both.

9.2 Subterranean Conditions. If during construction Builder should determine that any soil or subterranean conditions exist that will substantially increase the cost of construction, Builder shall notify Owner of the condition and the approximate cost to remedy the condition. Owner will have the option to sign a change order authorizing the necessary work and materials to remedy the condition. Such conditions that it is out of the Builders control are as follows but not limited to; removal and disposal of rock, and removal, disposal, and replacement of soil with insufficient load bearing characteristics. On a Fixed Price Contract abnormal footers, two foot or deeper, will be the Owners responsibility to pay the overage amount. The Owner is required to pay any extra costs associated with the Footers and Excavation work in order to build the plan per specs. Builder is not responsible to costs associated for extra Excavation work required on a Fixed Price Contract.

9.3 Subcontractors/Workers. Builder, being fully responsible for the general management of the building operation, shall have full directing authority over the execution of all subcontractors. Owner agrees that the direction and supervision of the workers on the Project, including subcontractors, rests exclusively with Builder, and Owner agrees not to issue any instruction or to otherwise interfere with such workers and subcontractors. Owner further agrees not to contract with Builder's subcontractors or to engage other builders, subcontractors, or workers for work on or about the Project except after completion.

9.4 Grade of Land. Builder agrees that the grade of the Property upon completion will be such that water will drain away from the residence. Owner hereby agrees that Builder has made no other representations regarding the final grade of the lot after completion of the Project, and Owner recognizes that final grade of the lot will be dictated by the Plans and ordinary construction practices.

Exhibit 1 – Page 7

**9.5** Surface Water. The amount of surface water traversing a lot is subject to the intensity and duration of rainfall and will vary according to terrain and location. The Builder makes no representations or warranty concerning the amount of surface water that will traverse the lot during periods of peak rainfall, and shall not be responsible or liable for any claims of any kind or character resulting therefrom, except to meet the requirements of the applicable Code Enforcement Department and or as set forth in any written warranty provided Owner.

## Article 10. Warranty

**10.1** At the completion of this project, Contractor shall execute an instrument to Owner warranting the project for **(1) year** against defects in workmanship or materials utilized. The manufacturer's warranty will prevail. No legal action of any kind relating to the project, project performance or this contract shall be initiated by either party against the other party after **(1) year** beyond the completion of the project or cessation of work.

## Article 11. Termination of the Contract

**11.1** If Builder is in Violation of this Agreement, Owner shall give Builder written notice of any such violation, and Builder will then be allowed fifteen (15) days within which to cure any such violation. If, after such fifteen (15) day period, Owner continues to assert that a violation has occurred, Owner may then initiate arbitration pursuant to Paragraph 14.2 to determine whether Builder has violated this Agreement. Upon violation of this Agreement by Owner, Builder shall give Owner written notice of any such violation and Owner will be allowed fifteen (15) day period, Builder continues to assert that a violation has occurred, Builder may then initiate arbitration, in the event of a payment default, terminate this Agreement.

## Article 12. Acceptance and Occupancy

**12.1** Upon completion, the project shall be inspected by the Owner and the Contractor, and any repairs necessary to comply with the contract documents shall be made by the Contractor. Buyers are encouraged to do a final walk thru on the property to inspect any cosmetic defects. If there are any, they need to be written down on a list and given to Builder before closing. Builder will complete the items that are of reasonable concern related to the cosmetic appearance of the property. If any items are not completed before closing, Builder will sign off on these agreed upon items to be done in a reasonable amount of time. After both parties signs off on the agreed upon items, Builder will not be expected to come back and fix cosmetic work after the homeowners move into the property. We are not responsible for any damages that occur on the property such as moving in furniture or the normal wear and tear of living in the home. After the final walk thru has been completed and all items on the list have been taken care of, Builder is not required to do any cosmetic work that is not related to standard warranty work.

**12.2** Nursery Stock, Natural Trees, and Lawn Sod/Seeding. Builder shall use reasonable care to protect the health of pre-existing trees during construction, but if unable to do so, may have to remove some or all of the natural trees or other vegetation unless caused by gross

Exhibit 1 – Page 8

negligence or intentional act and shall not be obligated to remove damaged or unhealthy natural trees except pursuant to change order. Any nursery stock installed by Builder shall be healthy and alive (or in a seasonal dormant state) at the time of completion. The type and amount of nursery stock will be dictated by the Plans, the Builder's Specifications or by Builder's ordinary construction practices. Builder shall not be responsible for planting the nursery stock, trees, and landscaping required under this Agreement once and, if seeding of the lawn is required under this Agreement, for seeding the lawn once. Builder does not in any way warranty or guarantee natural trees, nursery stock, landscaping, and/or lawn seeding or sod, all of which shall become the responsibility of the Owner upon completion.

12.3   If any items under warranty has been altered, adjusted, or worked upon in any manner by the purchaser, it will invalidate any further warranty by Luxe Homes and Design, its subcontractors, or the manufacturer

12.4   The Owner shall not occupy the property until final payment has been received by the Contractor and a Certificate of Occupancy has been obtained.

12.5   Occupancy of the project by the Owner in violation of Article 16.2, shall constitute unconditional acceptance of the project and a waiver of any defects or uncompleted work.

12.6   Warranty. Builder agrees to provide a written Limited Warranty as part of this agreement. Owner acknowledges receipt of a copy of the Home Warranty agreement and further understands and acknowledges that;

> OWNER ACCEPTS THIS LIMITED HOME WARRANTY IN LIEU OF ANY AND ALL OTHER WARRANTIES INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF HABITABILITY. THERE ARE NO WARRANTIES, WHICH EXTEND BEYOND THE TERMS OF THIS LIMITED WARRANTY. ANY OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE EXCLUDED AND DISCLAIMED. THE LIMITED WARRANTY DOES NOT COVER CONSEQUENTIAL OR INCIDENTAL DAMAGES AND TOTAL MAXIMUM LIABILITY UNDER THIS LIMITED WARRANTY IS LIMITED TO THE PURCHASE PRICE SHOWN ABOVE.

WITNESS our hand and seal on this _____ day of _____, 20___. ·

_____          _____
Jenny Blalock                                           Felon and Donna Wilson


Exhibit 1 – Page 9

Owner/Contractor                    Homeowner

Exhibit 1 – Page 10

## EXHIBIT A



**Wilson Residence**
**Exhibit A**



| | |
|---|---|
| **Foyer:**<br><br>**Regina Andrews 55-7625** | |
| **Dining Room**<br><br>**Wainscoting similar to this** | |

Exhibit 1 – Page 11



Great Room

4 rustic wood beams in ceiling

Black Walnut Floors

Painted brick, wood mantel, old not painted brick on the bottom

Exhibit 1 – Page 12

**Family Room**

**Two fireplace sconces**

**Mantel Design Brick (either painted or not) and T&G at the top, wood mantel (not like shown)**



Upstairs sconce light and fireplace sconce

Exhibit 1 – Page 13

| Kitchen:

French Vanilla Shaker cabinets on perimeter

Sprout on Island




Danze faucet

Instant hot water


Butler cabinets to be sprout


Two pendants over island



Wood Herringbone tiles behind butler pantry |



Exhibit 1 – Page 14



Swanstone prep sink 13 1/2x15 ½  with disposal   Danze prep faucet

Custom Hood similar to picture and Tile backsplash TBD

Exhibit 1 – Page 15

| | |
|---|---|
| **Breakfast Nook** |  |
| **Appliances** | |
| | |

Exhibit 1 – Page 16

| | |
|---|---|
| **Powder Room** |  |
| **Master:** | |
| **Klth:** | |
| **Home Crest Shaker Cabinets** | |
| **CLASSIC** | |

Exhibit 1 – Page 17

| | |
|---|---|
| **12" X 24" – CARRARA**<br><br>**ON FLOORS**<br><br><br><br><br><br>Kohler K-11076-4-BN<br><br>(2)<br><br>Kohler comfort height toilets<br><br><br><br>**Kohler**<br><br>**Faucets**<br><br>**American standard rain head** |  |

Exhibit 1 – Page 18



Exhibit 1 – Page 19

| | |
|---|---|
| **Master Bedroom**<br><br>**And sitting room** |  |
| **Bath 2**<br><br>**Homecrest Sand Dollar**<br><br><br>**EDGEMER E BAY**<br><br><br><br>Delta | |

Exhibit 1 – Page 20



| (2) | |
|---|---|
| | Tile Shower |
| Interior Door Hardware<br><br>Schlage | Hollow core single panel , with white trim (base, crown, etc.) 51/4" base on main, 5 ¼" crown on main in foyer, kitchen, hallways, master, powder, master bath, dining room, great room |

Exhibit 1 – Page 21

| | |
|---|---|
| Bed 2: |  |
| Main Level Bedroom/study | |
| Laundry<br><br>Homecrest Spout shaker style, no beadboard<br><br><br>Aloma 5.9" x 23.6" - Bianco<br><br><br>KRAUS SINK WITH | |

Exhibit 1 – Page 22

| KOHLER PULL OUT FAUCET | |
|---|---|
| **Upstairs Baths**<br><br>Homecrest<br><br>Willow<br><br>Tile:<br>Edgemere<br>cape 6x24<br><br><br><br><br><br>Kohler<br>faucets | |





| | |
|---|---|
| | Fiberglass Tub/Shower unit/white |
| Upstairs Bedroom/Office<br><br>Minka<br><br>Aristakraft white cabinets<br><br><br>**TrafficMASTER Allure 6 in. x 36 in. Pacific Pine Resilient Vinyl Plank Flooring (24 sq. ft. / case)** | |
| **Exterior Lights** | Two on Front |

Exhibit 1 – Page 24

| | 7 soffit can lights |
|---|---|
| Exterior | <br><br>shutter style/color?<br><br>Tamco Thunderstorm Gray |

Exhibit 1 – Page 25

| | |
|---|---|
| | <br><br>**Gutters:**                                    **Bronze**<br><br>**Garage Doors: Dalton 9450 Lexington**<br><br>with windows |
| **Insulation** | CRAWL SPACE PACKAGE: R-19 Kraft Faced Insulation In floor 6 Mil Poly Ground Cover CRAWL SPACE PACKAGE (Package Is Included In Total)<br><br>FLASH PACKAGE: Approx. 1/2" Closed Cell Spray Foam on 1st Floor Exterior Walls FLASH (Package Is Included In Total)<br><br>FIBERGLASS PACKAGE: R-13 Kraft Faced insulation on 1st Floor Exterior Walls R-13 Kraft Faced Insulation in 1st Floor Knee Wall R-38 Kraft Faced Insulation in 1st Floor Sloped Ceiling R-38 Kraft Faced Insulation in Tray Ceiling R-13 Kraft Faced Insulation in 2nd Floor Exterior Walls Cardboard Baffle at Eave Polyvent at Eave R-13 Kraft Faced Insulation in Garage Exterior Walls R-19 Kraft Faced Insulation in Garage Ceiling<br><br>FIBERGLASS PACKAGE (Package Is Included In Total)<br><br>Attic PACKAGE: R-38 Blown in Insulation in 2nd Floor Ceiling Attic |
| **HVAC** | Second Floor Carrier 2 ton 180, nom. 14 seer, Main Floor 5 ton/15kw/nom 14 seer<br><br>Includes digital thermostats non programmable |

Exhibit 1 – Page 26

| | |
|---|---|
| | **\*\*Water Heater will be tankless system with Manifold Pluming System\*\*** |
| **Footings and** | See section 9.2 on contract for abnormal footings. If rock is found in footings, the cost to rent a breaker is about 350.00 a day. Adding labor with rental would be approx. $600.00-$800.00 a day depending on how much time it takes.<br><br>Slab to have rebar, cut joints and stained. Wire mesh can be added for .20 a square foot. |
| **Windows and Doors** | **Energy Star Rated**<br><br>Double Doors<br><br> |
| **Interior Colors**<br><br>**TBD** | |

Exhibit 1 – Page 27

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been properly mailed, by placing same in the United States Mail, postage prepaid, to:

William Carver, Esq.
Attorney for Jenny Blalock and Luxe Homes
and Design, Inc.
Kramer Rayson LLP
800 South Gay Street
Suite 2500
Knoxville, Tennessee 37929

Plantation Reclaimed, Inc.
Jenny Blalock, Registered Agent
1122 Anthem View Lane
Knoxville, Tennessee 37922

Respectfully submitted this 3rd day of May, 2017.

William Wilson
Co-counsel for Plaintiff